The next case up is 4121072, Bowles v. Owens-Illinois. For the appellants is Andrew Kelly. Are you ready sir? Yes. For the appellee is Matthew Fisher and Michael Pollard. This time we're dividing it in even increments of 10 minutes. Okay. That'll be easy. Okay. Mr. Kelly, you may proceed. Thank you. Good morning. As indicated, my name is Andrew Kelly. I'm from the law firm of Wilder Corwin Kelly in Bloomington, Illinois, and I represent Virginia Bowles both individually and as the special administrator of her husband Gerald Bowles' estate. He's a Navy serviceman, as you're well aware from the pleadings that were filed in this case, and this case largely relates to his exposures on one particular ship, the USS Floyd v. Parks, from late 1958 until the early 1960s. I'm here today asking that you reverse the grant of summary judgment that came down from the trial court in Adams County down in Quincy as to the two defendants that are here today, Owens-Illinois and John Crane. I think you only need to look at the actual order in this case, which is appended to page, I think it's pagination of A1 through 19, and look at the applicable case law related to summary judgment in an asbestos exposure case such as this, which is Thacker. Counsel, just keep arguing. I brought the wrong file. I'll be right back. The Thacker case, as this court is well aware, largely stemmed from the adoption of the 4th District's opinion in Waymire, which discussed frequency, regularity, and proximity tests. And if you look at Waymire, you look at Thacker, and you look at what the trial court did in this particular instance, I think the only conclusion you can reach is that the trial court used the wrong analysis in arriving at its decision, granting summary judgment to these two defendants. If you look at the Waymire case, it says right in Waymire at page 337 of the official reporter that each case must stand on its own facts. Each case must stand on its own facts, and that was language that was cited with approval in the Thacker case. And every case since Thacker has looked at every single case on its own facts. And that includes all the case law that both sides have provided to you today, whether it's the Johnson case out of the 3rd District, the Zimmer case out of the 1st District. Whatever case you look at that's been analyzed under the Thacker test is one that has looked at each case on its own facts. And that's not what occurred in this instance. In fact, if you look at page A11 of the appendix, you can see where one of the things the trial court did was actually did a case-by-case analysis, but not looking at the case of Bowles on its own, but comparing Bowles side-by-side in an analysis with Thacker to see if... How is that inconsistent with analyzing the case on its own facts when the court takes out its facts and analyzes it? Well, I think what they're doing actually is... What the trial court did, if you actually look at it, is analyze what the exposures were, what the length of the exposures were, where the exposures were, and the type of work that the person did in Bowles versus what happened in Thacker, and essentially used Thacker as a baseline. And you can actually read some of the things that the trial court said after it conducted its analysis going on to page A12, page 12 of the actual order, where one of the things the court said was that, well, you know, this case doesn't rise to the level of Thacker. And that's inappropriate at this point. Thacker stood for what Thacker said, which is it enunciated the test that is to be used at summary judgment. It's a test that's been used by a number of justices, not even just on this court, but throughout the state. And it's one where you always analyze the particular case to see if there are evidence that's been provided that rises to the level of frequency, regularity, and proximity based on that case alone. And if you look at the evidence in this case, and I'm going to get to it in a moment, there was sufficient evidence that had been provided that all inferences being made in favor of the plaintiff, as is required at the summary judgment stage, required summary judgment be denied. Now, there's a lot of arguments that were made in the briefs. There were a lot of arguments that were raised to the trial court, and the trial court actually asked a lot of questions requiring a lot of discussion about the various witnesses and evidence in the case. But none of those are issues which are summary judgment issues. The question here at this point is not the credibility of the witnesses, not whether or not those witnesses are going to be subject to cross-examination that may cause a jury to question their credibility or what have you. All of those are issues for the jury to determine. At summary judgment, the question is simply, is there enough evidence of frequency, regularity, and proximity with that particular defendant's product to submit this case to a jury? One of the other things that if you look at the trial court's order is that the trial court was very preoccupied in terms of the questions that were posed when we argued these at summary judgment, and in addition in the order itself, to the fact that Mr. Bowles was not a hands-on worker with asbestos products. He was a radio man. He served on the USS Floyd v. Parks, which is a destroyer, and for those of you like myself that never served on a Navy destroyer, it's a ship that's about 400 feet from bow to stern. It has various decks that are all connected. It's very small compartments and spaces, and even the military, the Department of Veteran Affairs, as we indicated, I think it's page 7 of our reply brief, has indicated that these types of ships were poorly ventilated, poorly ventilated such that anybody that served on those ships was likely to have been exposed to asbestos dust, and that comported with what the expert stated in this case as well. Moreover, the Thacker case, which again flows from this court's opinion in Waymire, never required an individual to actually have had to work hands-on with a particular defendant's asbestos product in order to get past summary judgment. That's never been a requirement. It never has been at any point, but the trial court was preoccupied by that, and if you analyze the court's order, you can see that the approach that was taken was one that did not fall in line with what the applicable case law is on summary judgment in an asbestos case. You said the court was preoccupied, but wasn't the court taking these things into consideration in determining whether the frequency, regularity, and proximity test was met? I think the trial court was asking, my understanding was the trial court never had an asbestos case before, and I think he was trying to get an understanding of all of the various issues that could come into a case such as this one, having all of the asbestos case law for the state of Illinois in front of him, and I think he was asking a lot of appropriate questions in order to try to understand what the law was and how it was applied in these cases. I think the problem that we run into in this case, though, is that regardless of whether or not Mr. Bowles worked hands-on with the products, the trial court's analysis strayed into sort of this side-by-side analysis of, well, did this case, the Bowles case, have more exposure than Thacker, or did it have more exposure than Wehmeyer? And that's not the baseline. This case stands on its own facts, and if you look at the facts in this case, there is evidence of frequency, regularity, and proximity. One of the things that struck me last night as I was looking at the briefs and everything for the last time before I went to bed and drove here this morning, was the fact that this case is kind of unique in the sense that if you look at the facts of this case, all the parties generally agree it's the same testimony that you need to look at. We have different characterizations of it, but it's generally all the same testimony. Same with the case law. I think the difference is what you are calling a reasonable inference. The opposing counsel is going to call speculation. I agree, and I think that's the distinction. I think everyone agrees that Thacker is the test, and as much as Owens, Illinois spent some time in its brief urging that this court follow Thacker, I don't think anyone is disputing it's the test. And if you apply it to the law, Thacker came essentially, as I said, from Wehmeyer, which adopted the Lorman standard, which is from another state. But it simply requires that a plaintiff, in order to get past summary judgment, in order to provide evidence sufficient for causation in an asbestos case, which, as every court has analyzed, there's not always individuals that can actually say, yes, I saw these invisible fibers that were released from this product inhaled in this person's lungs, and that's why they created the test. The standard is simply the plaintiff must show that the exposed person regularly worked in proximity to dust created by the product. If we look at Mr. Bowles, regularity of employment, he was on this ship essentially 1.5 years. And in comparison to cases such as Thacker or Wehmeyer, virtually most cases that aren't Navy cases, people go to work for 8 hours, maybe they work overtime for 10 or what have you, and then they go home. They may work 28 years at a particular site such as that, where they go home, come back to work, they have weekends off or what have you. Mr. Bowles' exposure was different. The 1.5 years that he spent on the USS Floyd v. Parks, he ate there, he slept there, he stood watch there, he performed all his radioman work duties on ship. He was there 24-7. It was regular onboard involvement throughout the space of that particular ship. Mr. McCaffrey, his testimony was appended, and the citation I'm going to give you is at 76661 of the record. He's the defense expert, a naval expert of John Crane, and one of the things that he said repeatedly at deposition was that it was impossible for Mr. Bowles to have not gone throughout the ship in living his daily life. And one of the things he described was that even just to get a pack of smokes, and of course Mr. Bowles was a smoker, he would have had to go through the various compartments of the ship to get up to the ship store. He would have had to go through the various compartments of the ship to get up to the radio area where he performed his duties. He slept below deck. The mess hall was below deck. If they were loading ammunition, he would have to go below down into the actual engineering spaces, the boiler room and such, in order to have a cigarette so that he didn't put the ship at risk with a spark from his cigarette or what have you. That was part of the routine of the very ship, and that's what he did for 1.5 years. Part of his duties also required him to go and deliver messages as a radioman to the captain of the ship, wherever the captain may be. And that is regular employment, 1.5 years, in a ship that's a small, confined space, where the evidence is there was insulation on all the pipes running throughout the ship, not just in the engineering and boiler spaces, but throughout the entirety of that ship. In fact, the evidence was that there was pipe insulation running through the bunking areas where he would have slept. It ran through the mess halls where he would have ate. It even ran into the latrine or the head or whatever you want to call it, where he would have showered and performed his hygienic functions and stuff. He was exposed to all those areas. In addition to that, frequency of the use of the product, the insulation was everywhere on the ship. And as I said before, it was on every type of piping, and that was Mr. Revell. His testimony was provided, and he was on the ship. He actually left in 1958. He overlapped with Mr. Bullock. Was the insulation included as part of the asbestos? Yes. On all the pipes all over the ship? On all the pipes that were of hot or steam that ran throughout the ship. There was also evidence that some of the cold water lines that went into some of the sewer lines and the bathrooms and such also would have contained asbestos. But there was lines that went throughout the Navy ship that contained asbestos. And that was true not just in the mess hall and everything else, but in all the connecting areas to the various parts of the ship. The pipes ran throughout, and they were exposed. It's not like a building such as this where there's pipes in the wall and it's covered. I mean, they were just running, and you could see them visibly, and they were covered with insulation. Mr. Revell, at page 5111 of the record, indicated that not only was insulation that contained asbestos throughout the ship, but Owens, Illinois' KALO product was all over the ship. And as I mentioned before, he overlapped for one year, basically. His last year was Mr. Bullock's first year on the ship, and he indicated that that insulation was throughout the ship. And that was his testimony as of the time that he left in 1958. It was already there, already in place, Owens, Illinois' KALO material. It's not surprising KALO was on the ship. The military has certain specifications and only certain approved manufacturers, and the evidence in the case is that there were sort of a top three that were used, and Owens, Illinois' KALO product, K-A-Y-L-O, was one of them. That's 5071 to 7-3 of the record. Mr. Revell recalled seeing the KALO name, and in addition to that, another shipmate, Mr. Rogers, indicated he actually saw boxes of Owens, Illinois' KALO material in the engineering spaces, something that they would keep in order to do repairs and replacements as needed if they were at sea or what have you. He actually saw that on board the ship as well. So we have Mr. Revell saying it was throughout the ship when he left in 1958. We have Mr. Rogers saying that during his time, which also overlapped with Mr. Bull's, that he saw boxes of Owens, Illinois' insulation on there as well. Was there frequent exposure to the insulation by Mr. Bull's? Absolutely, and there was a lot of evidence that was provided with respect to that. After Mr. Revell left in 1958, again having said that there was already Owens, Illinois' KALO insulation in place on the ship, Mr. McCaffrey testified that based on the ship's records, from November 59 until February 1960, after that fact, there was a dry dock repair at Long Beach Station of the USS Floyd Bee Parks where 107 man days were spent removing and replacing insulation on board that ship. And the evidence was also that when they were doing that repair work, when they were doing that tear out, stuff that would cause... Mr. Kelly, let me ask you something about the order in this case that the judge wrote. I found extraordinarily thoughtful. We aren't often the beneficiaries of the kind of care shown by trial court that Judge Drummond did here. But you began your argument by talking about how the court erred because it... You know, each case must stand on its own facts, but I'm reading page 15 from the decision, as noted by the 4th District's decision winner, which has been more excited than Packer, each case must stand on its own facts, says the trial court. So you're arguing to us that we ought not believe its own statements and its analysis of its ruling? Well, what I'm saying is I think the judge was well aware of what the various case law had said, and right, he did actually point that out right in his papers. But if you actually look at what the order did, it conducted a side-by-side analysis based on Thacker, and if you look at the conclusions reached by the trial court, what the trial court essentially did was weigh the evidence. Weigh the evidence as to whether or not it was believable that enough asbestos fibers could have been inhaled by an individual like Mr. Bowles, given the fact that he was somebody that didn't work hands-on with a particular product. Well, but the last paragraph, the next paragraph to what I just read says, it appears that under Wehmeyer, talking about fiber drift evidence and other factors and what's necessary for you to prove your case, the plaintiff cannot satisfy the prongs of showing how frequently the product was used, where it was used, and the regularity of its employment within that zone. That's all fact-specific for this particular case, isn't it? It is, but what I'm telling you and what I've been arguing to you already today is that if you actually look at the facts, it's one thing to say, I've looked at these things and this is my conclusion, but if you actually look at the facts, I mean, that's one of the things I was just talking about was regularity. He was on the ship for 1.5 years. He was always on the ship. He never left it. Frequency of use, the insulation was everywhere, in place, on the ship, including Owen's Illinois Caleb. If we go to John Crane, gaskets and packing, Mr. Rogers testified that they routinely, several times a week, that's at 7, 6, 15, and 51, 38 of the record, would repair and replace steam line gaskets and valve stem packing on the various piping and pump systems on board the ship. It was something that they did routinely, in his own words. Frequency of that is that it occurred frequently. It occurred routinely and it occurred weekly as to the gaskets. And in terms of the frequency of the use of insulation, it's not necessarily, in this case, like what we would find in a power plant or something where you'd have evidence of somebody saying, well, yes, I frequently changed insulation on pipes or what have you. It's a little different. That occurred on board ship, but the major exposure, according to the defendant's very own witnesses, is that the way that asbestos would get into the air and expose naval servicemen on ships such as this is that when they were at sea, and the ship would cavitate in high seas, or more likely, every time when they were at sea and they would have firing exercise, the whole ship would basically vibrate and you would have dust out. And it's a phenomenon that these naval experts all talk about, which is it would shake the pipes, it would shake the entire ship, and you'd have dust come off the asbestos insulation. And it would become part of the dust of the entire ship, which goes back to exactly what the Thacker Court talked about, which is the evidence in that case, in Thacker, the Supreme Court found was sufficient. They found it was sufficient because they found the product was at the site, it created dust, it contributed to the environment of the particular plant where Wes Thacker worked, and that anybody that was in that area would have been exposed to it. And that was a reasonable inference, and for that reason, the court reached the conclusion that it did in Thacker. Very similar to what happened in Wayliar. Very similar to what Justice Kinect wrote in the Spain case, in which Your Honor Justice Steigman concurred in that opinion, which is that Marshall Spain worked at ADM in Decatur. And one of the things that was acknowledged in that particular instance was the fact that But other evidence was provided that Kalo was used at that location, that it created dust, that it was an asbestos-containing product, and because he worked there for a number of years, that was sufficient in the Spain case to support denial of a motion for judgment NOV. That's what this court concluded in Spain. This case is exactly the same. In fact, in some ways, it's even probably a little bit different in the sense that he never left the ship. He was always exposed to that environment where the dust was put into the air. He lived there, ate there, slept there, in addition to doing his work. There's evidence in this case, whether you look at Wayliar, the Johnson opinion, which I discussed in our papers, the Spain case, which I already mentioned, even the Caruso decision, which Justice Kinect wrote in 2003, I think it was, that there is evidence that the products were at and present onboard the ship, that those products created dust. If we're talking about insulation, it's from the dust-out. It's from repair work. If we're talking about the gaskets, it's from the repair and replacement work that Mr. Rogers talked about, and that that necessarily contributed to the error of the plan. And as I already indicated to you, the evidence in the case was that there was no way that Mr. Bowles could not be in the area where all of those types of things were present. And for all those reasons, that's why we're asking you to reverse the decision of the trial court in this particular case. Thank you, counsel. Mr. Fisher, I guess you will be first up. Yes, sir. Thank you. Good morning again. May it please the Court. Mr. Bowles had a 21-year naval career, but it is true that at this point his exposure claim is limited to his service on the parks for about 18 months. The conspiracy plan against Owens, Illinois has been dropped. The case calls for a very straightforward application of Thacker. Thacker has served the state well for more than 20 years. What was the procedural posture in Thacker? It was a J-O-V after a trial. And the Supreme Court said what? The Supreme Court affirmed the judgments for the plaintiffs. They announced the Thacker test and then concluded that the Thacker test of frequency, regularity, and proximity had been satisfied and therefore the judgments could be affirmed. Okay. Here, of course, we're on summary judgment. That was an argument that was considered, in fact, by the Johnson case, the Third Circuit in 1996 when lawyers from Mr. Kelly's predecessor firm argued that Thacker shouldn't apply at the summary judgment stage. And in Johnson, the Third Circuit announced that, yes, indeed, Thacker does provide the substantive test that ought to be used at summary judgment to determine whether or not a case should go to the jury based on whether or not there is a genuine issue to be determined by the fact finder. Thacker requires, of course, evidence, in this case with regard to Owens, Illinois, and Kalo that it was frequently used in an area where Mr. Bowles regularly was in proximity to its use. Frequent use in this context is the first prong of that test. And use means something that would cause dust to be released from that product. Use is not Kalo was in a box in the boiler room. Use is not there was insulation on a pipe that may or may not have been Kalo that was covered in cement, covered in cloth, and then painted over. Use, as established in Thacker and Waymire and Weber and the other cases, is a use that would cause asbestos fibers to be released from the product. We don't have evidence of use here with regard to Owens, Illinois, and Kalo, let alone frequent use. What Mr. Rogers saw was Kalo in the boiler room. I'm sorry, boxes of Kalo in the boiler room. There's no evidence that it was cut or sawed or even installed while Mr. Bowles was present. Is there evidence that there was dust throughout the destroyer when they would do firing exercises? There is expert testimony, Your Honor, that it was possible on naval ships that you could have a dusting out if guns were fired. There was not evidence in this case that dust emitted from thermal insulation products at the firing of guns on the parks. Indeed, the testimony of Mr. McCaffrey, who was a crane expert, not Owens, in connection with fiberglass insulation, not asbestos-containing thermal insulation that, as this record establishes, was typically covered in cement, then covered in cloth, and then painted over. Anytime you have a vibration of anything, whether it be a naval ship or a desk or anything, if there's subtle dust on it, that dust will likely move. But there's absolutely no evidence that asbestos fibers came out of thermal insulation and somehow became part of the atmosphere of the ship. The ship is moving through the ocean. There's no evidence that the ship was laden with asbestos. In Thacker, they talk about how the air in the anarcho plant was thick with asbestos such that the plaintiff would necessarily breathe that asbestos. There's no evidence here that would support that kind of conclusion. As I said, not only do we have an absence of evidence of use, certainly nothing with regard to a frequent use that would satisfy the Thacker test. Next we move to where did Mr. Bowles regularly work. He was a radio man. A radio man is responsible for communications. He typically did his work in the radio shack. Mr. Bowles had a berthing department that was at the front of the ship. The boiler room, the only place where we have testimony from a witness with a foundation about the presence of ozone like halo, is well below decks and to the aft of the ship. No evidence whatsoever that dust, even if we assume that the halo got out of the box and was installed during Mr. Bowles' presence, that dust from that product could have gotten to a place where Mr. Bowles regularly worked. Mr. Kelly argued that there were pipes throughout the ship, and that's true. Not all those pipes, though, were insulated. The insulation that was on those pipes was not always asbestos-containing insulation, and there's no evidence that would allow this court or any reasonable fact finder to infer that the thermal insulation that existed was ozone-like halo throughout the ship. There was one witness who said that he believed that something called K-O, from what he saw in metal straps, was throughout the ship. No evidence that he had any foundation to convert that from the initials K-O, which was his initial testimony, to K-Lo, a product made by ozone-on. No evidence that he had a foundation to say what was throughout the ship. No evidence that he had any... Well, is there any such thing to your knowledge, or is there anything in the record that suggests that it was a K-O asbestos product? Well, remember, Your Honor, the K-O wasn't on the insulation. It was on a metal strap that, according to this witness, was holding the insulation in place. I'm not aware of any metal straps that say K-O. I'm not aware of any thermal insulation products that say K-O. With regard to evidence in this record, Owens, Illinois' expert, Captain William Lowell, who was a civilian employee of the Bath Iron Works and supervised the construction of ships, was asked whether or not he had any familiarity with metal straps holding thermal insulation or anything with K-O. He said not only did he say no, he had no familiarity with it, but that he believed that that would not be something that was done on naval ships, that insulation was not held in place, thermal insulation, was not held in place with metal straps like that. Instead, it tended to be cemented, wrapped in cloth, and then painted. So the other thing that's important with regard to that particular witness, at the deposition when he was asked, are you sure that it was this K-O product that you recall, which he then converted to K-Lo with some leading questions by plaintiff's counsel, are you sure it was the parks and not one of the many ships that you served on after the parks? And he said, no, I can't be sure of that. When he was asked if he could swear that this K-Lo or K-O product was on the parks, he said, no, it's really a guess. So Mr. Rogers is the only witness in the case who says he saw a box and could identify it as an Owens, Illinois product, and as I said, restricted to the boiler room, only in the box. With regard to proximity, because Mr. Bowles, there's no evidence that he was ever in the vicinity of an Owens, Illinois K-Lo insulation, there's of course no evidence about specifically what his proximity could have been. Plaintiffs seek to go to a fiber grift theory here and say that the air, of course, was just laden with asbestos generally, and therefore that's sufficient. It's not. There is no evidence of that. And even if one might move over to there was asbestos in the air, it's not asbestos from Owens, Illinois K-Lo. That was Judge Drummond's point when he said, even if there's evidence of thermal insulation, no one can identify the brand of that product, and therefore no one could possibly identify the fibers that supposedly... Counsel, before you run out of time, I don't know if you have your brief handy, but on page 25, you have a footnote 5, and I've read that a couple times. Can you clarify for me what you're suggesting there? With regard to Mr. McCaffrey's testimony. Footnote 5. Yes, McCaffrey's testimony was introduced into the record as to Owens, Illinois, on reconsideration. So the question is whether or not it was available when the case was first argued, because of course there would be a different standard in evaluating the plaintiff's motion to reconsider as opposed to in evaluating the summary judgment decision that was originally ruled on. So that's why the dates are provided to the court here. Mr. McCaffrey's testimony. You call it non-evidence in footnote 5, so you're saying it shouldn't have been considered? I mean, is that what you mean by that? At the very end, you call it non-evidence. Non-evidence in the sense that it wasn't in the record at the time the summary judgment was considered, and that in addition, of course, it's expert testimony that we believe is without a factual foundation. Okay. Okay, thank you, Counsel. Thank you. We, of course, ask that the judgment be affirmed. Mr. Pollard. Thank you very much, Your Honor. May it please the Court, Michael Pollard on behalf of John Crane, Inc. Counsel. I would ask that the Court do what the trial court did in this case, which is look at this case. It's all particular facts, which is what Waymeyer and what Thacker suggest the Court do, and it's what the trial court did here. And with respect to my client, John Craning, I think the evidence demonstrates not only that the signature features of the fiber drip theory are absent, but I think the signature features of the application of the fiber drip theory have been contradicted by the record, in this case, and the record does not support them. And, of course, why is that important? Because in Thacker, the Court said that the fiber drip theory can be used to address the proximity problem, the frequency regularity and proximity test. So what are the facts? And, by the way, Thacker and Waymeyer, when they talk about sort of the signature features, they don't use that phrase. That's my phrase, but they say you look at the nature of the workplace, the type of asbestos that's being used, the way in which it's being used. And so I'd like to address very specifically what the evidence in the record is in this case. And it would be mindful that with respect to my client, not only is there only one ship, but there is only one witness. Fourteen others were deposed, but there's only one witness whose testimony is at issue. That's Mr. Rogers. First of all, we can talk about a couple of concessions made by plaintiff's counsel at the hearing. One is that plaintiff's counsel conceded, and this is at 83-27 in the record, that no one would testify that Mr. Bowles was in the vicinity of JCI products being used. He also testified, or he also acknowledged and conceded that JCI gasket and packing products are not friable within the meaning of OSHA and EPI. So if you rip them open with your hand, they don't release dust. So we're not talking about any insulation products. We're talking about encapsulated gasket and packing products. Mr. Rogers testified that no gasket or packing work was done on the parks outside the after-fire room. That's at page 76-18 on the record. He testified that the radio room, which is where Mr. Bowles regularly worked, was located on the main deck, 76-19. Mr. McCaffrey, JCI's expert, testified at 7. He described the location of where all this is. So we've got only gaskets and packings being done in the after-fire room. That is located, according to Mr. McCaffrey, and there's no contrary evidence in the record, two decks away from the radio room. It is separated by numbers of ladders and two or three hatches. And that that room was ventilated. Wasn't there evidence that the decedent was on board during the dry dock repair? Was stationed to be on the ship during the dry dock repair? Rogers is the only person whose testimony is here, and the testimony I have is all there is. All right. What was the testimony with regard to where the decedent was stationed during the dry dock? Was there none? I don't know. I can't recall. Okay. You were talking about McCaffrey. Didn't McCaffrey opine that during the dry dock, the decedent could not have avoided exposure to the dust? Well, he's a radio man. I can't hear you. He is a radio man. I'm not sure there is testimony that he's there while the ship was being done in dry dock. I mean, the only testimony we have is the testimony of Mr. Rogers. And that he places it only in the after fire. Not only that. I mean, that's not all. He also says, and this is at 7616, when removing metallic gaskets, it didn't create any dust. He didn't remember any dust when removing sheet gaskets from fuelers. So, Mr. Rogers, the only witness whose testimony is implicated here, has the work being done with my client's products in one room, sealed off by multiple hatches on a different deck that's ventilated out of a smokestack, that it doesn't create any dust, and that he never saw Mr. Bowles in the vicinity. So this is far, far removed from cases where there's an open room, lots of asbestos product, lots of friable asbestos product where a person is in the vicinity. Those characteristic features of the fiber dust theory are rebutted in this case, not just absent. And I think you heard counsel's argument. There wasn't a whole lot of argument about John Crane and gaskets and packing, and I think that's why. With respect to my client's product, it is limited in a certain place. Rogers said it didn't create dust. And that's all there was. And I think the trial court thoughtfully considered this and wrote an opinion which I agree with, Justice. I mean, you don't see many that are this fulsome as the opinion in this case. And so I do think that if the court looks at my client's product, the workplace where it was used, its characteristic features as testified to by the only witness whose testimony counts, the fiber drift theory does not apply, and the summary judgment should be affirmed. I think anything to the contrary is speculation. And, of course, that's what summary judgment is intended to provide. So I think on the facts of this case we are entitled to summary judgment. Okay. Thank you, counsel. Mr. Calley, any rebuttals, sir? Yes. Okay. I'll start first of all with John Crane. One of the last things suggested to you is, well, our product didn't create any dust. Nobody saw any dust. Asbestos products, as this court is well aware, you've all heard of asbestos cases in the past. The fibers that can cause disease, you can't see with the naked eye. You can't smell them. You can't see them. They don't have a taste. And that's why they do things like take dust samples. We provided in our papers, one of the experts that we would offer in this case is Mr. Richard Hatfield, and he conducted tests of the very types of products that John Crane made, in fact, actually using John Crane products, and what he found was that there was fiber release. You don't necessarily see the dust, but it gets in the air. It contaminates the entire workplace. It's not just limited to the person that does the hands-on work. You can even look at the MSD sheets of John Crane themselves, and one of the things they talk about is use of this product can put you at risk of developing diseases, including lung cancer, which is the very disease that Mr. Bowles had in this case. The recognition on their part that dust is created, and individuals that breathe the dust can be at risk of developing an asbestos disease. That's what the testimony is on that particular point. This whole concept of whether people actually saw dust, how much dust they saw, whether or not it went out a smokestack because it was perfect ventilation on those ships, that's a credibility issue for trial. That's for a jury to determine and assess. That's not the function at summary judgment. The issue at summary judgment is does the product create dust, was the individual frequently and regularly in the area where that dust was generated, or if you look at Thacker and Wehmeyer, were they in the general environment of that workplace, which is exactly what Mr. Bowles was. He lived on the workplace. His daily routine took him throughout the entire workplace. And to answer your question, Justice Turner, one of the things that McCaffrey did say, and he actually said it at page 751 and then again at 7654 of the record, is you couldn't have avoided being exposed to the dust from these products. That was his testimony. That's the John Crane expert talking about exposure to these asbestos products on board that very ship. It was also suggested to you by John Crane that, well, our product's not friable. Friability simply means can you crush it with hand pressure. Insulations, friable. A gasket, not friable if you just take a new gasket. But if you're packing out of a pump, if you're taking a gasket off of a steam line, it doesn't come off nice and clean. You have to work at it, use a grinder or a wire brush. And all the tests that Hatfield, including John Crane, has experts just like Hatfield, all of them have found when they do those tests, it creates dust. He's not alone on that particular point. Owens, Illinois, argued that, well, frequency in this case, nobody was talking about frequent use of actually repairing or replacing asbestos. That's an issue of semantics. As I already said to you, in this case, the frequency of exposure in this case isn't necessarily from use of the product. It's from dust out. It's from the firing exercises. And one of the questions that, Justice Turner, you posed was, well, was there any evidence that dust was released? I don't think you got an answer to the question. But at 52-15 and 52-28 of the record, Salvatore Lopez, which is another individual, shipmate, was on board from 56 up through 60 with Mr. Bowles, and he said there was dust released from every part of the ship when the guns would fire. That was what he testified about in terms of these insulations that were on the pipes, including insulation that Mr. Revell indicated included in place Owens, Illinois, KALO. That was the testimony that he received in this case. Was there testimony regarding how many times the guns were fired, and more specifically how many times the guns would be fired while the decedent was on this destroyer? There was. Mr. McCaffrey talked about it, that it would have been a regular occurrence. That's his expert testimony. In addition to that, Mr. Revell testified at page 50-82 of the record that firing exercises occurred every time the ship was at sea. And in addition to that, he indicated, and McCaffrey backed it up as a naval expert as well, it's not just firing the guns once. It's multiple concussions that you're going to have from multiple firings that cause this dust out. And there's no procedure on these ships where the dust out occurs and they evacuate the ship and then suck all the dust out. I mean, it stays in the environment. And that's why this case is akin to the Spain case, which individuals on this panel were a part of when that opinion was issued back in the 1990s, which is that products were on the ship, they created dust, this individual lived, worked, and slept in that environment, and the expert testimony in the case is he could not have avoided being exposed to that dust. And for that reason, you should reverse and let the jury determine the credibility issues, which is largely what you've heard today. Okay. Thank you, counsel. We'll take this matter into advisement. The hearing is adjourned.